Filed 5/4/23  P. v. Sula CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080237 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS318710) |
| KENG SULA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Enrique E. Camarena, Judge.  Affirmed.

Savannah Montanez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steven T. Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Keng Sula appeals a judgment following his conviction of one count of a criminal threat (Pen. Code, § 422);[1] one count of vandalism (§ 594, subds. (a), (b)(1)); and one count of arson (§ 451, subd. (d)). The jury also found true that Sula personally used a deadly and dangerous weapon, to wit: ax or hatchet, in making the criminal threat (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(1)(23)). On appeal, he raises three claims: 1) the trial court prejudicially erred by instructing the jury that it could find that the weapon he used in connection with making a criminal threat, a hatchet, was "inherently" deadly or dangerous; 2) the court abused its discretion when it declined to dismiss the one-year weapon enhancement based on an apparent misunderstanding of section 1385; and 3) even if the court understood its discretion under section 1385, the court abused that discretion because the evidence showed the offenses were connected to mental health issues. As we explain, we reject these contentions and affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### Prosecution Evidence

In early 2021, 39-year-old Sula was living in a three-bedroom house with his 57-year-old mother, B.S., and his 24-year old nephew, S.K. The home had security cameras in the front yard and outside S.K.'s bedroom, which provided video footage to S.K.'s phone. The front yard camera notified S.K. when somebody was entering or leaving the home.

Sula often carried a switchblade, butterfly knife, or another sharp object on his person. Sometimes he would carry other weapons, such as a hatchet, machete, hammer, drill or a kitchen butcher knife, and would "taunt[ ] [B.S. and S.K.] everywhere [they would] go, swinging it around." B.S. and S.K. would lock themselves in their rooms and sometimes avoid

---

[1]     All further statutory references are to the Penal Code.

leaving to eat or shower when Sula was home. Sula's demeanor toward B.S. and S.K. was angry and violent, with his treatment of B.S. being even "more evil" than his treatment of S.K. B.S. was afraid of Sula.

In the months leading up to the incident, Sula had threatened to burn down the house three or four times. Sula also had pushed S.K. against a mirror, requiring S.K. to go to the hospital for treatment for a sprained arm and "blood all over" his hands. Sula at another time also burned a beer glass on top of the stove. About two weeks before the incident, B.S. asked Sula what he was doing when she saw him holding a "big knife" and gathering sticks of wood to take into his bedroom. He replied, "Just go away, go away. I'm going to kill you. Just go away." Since that time, B.S. was afraid that Sula would in fact kill her.

On July 14, 2021, at 2:00 a.m., the morning of the incident, S.K. observed Sula entering and exiting the home through video footage on his phone. Sula had a knife with him, walked around, went outside the camera's view, returned to the front of the home, looked at the camera, and then went back inside. Around 6:00 a.m., both S.K. and B.S. left the home. In the front yard, there was a large Buddha shrine, to which B.S. would pray and give offerings. It did not appear damaged or destroyed when S.K. left for work that morning.

At 10:30 a.m., the front door camera recorded Sula breaking the Buddha shrine with a hatchet while yelling, "Stop fucking playing with me." B.S. returned home later that day and Sula "came out and was very upset at me and he was swinging something. And he said he's going to kill me." B.S. tried talking to Sula and asked how he was doing. In response, he said, "I'm doing it. I'm going to kill you." While Sula spoke, he stood about six feet away and swung a hatchet at B.S. Sula "sounded very vicious," "really stared

3

hard at" B.S., "was swinging the [hatchet] back and forth, and then [B.S.] was so scared so [she] ran away." B.S. testified, "I don't want to stand there and have him chop me up, so I just left." She believed Sula "was going to kill me, so I have to run away and call the police"; adding, "I think if I didn't run away on that day I would have been killed."

When police officers arrived, they observed Sula in the front yard breaking the Buddha shrine with the hatchet. He appeared "[v]ery aggressive" and "violent" and "demolished" the shrine. He immediately started yelling at the officers once they contacted him. Sula was "uncooperative and not complying with commands" and it took 30 minutes for the officers to arrest him.

The officers found B.S. across the street scared to the point that "she fell to her knees on the ground and started crying." After the officers arrested Sula, they took B.S. back to her home and she pointed out the damage caused by Sula, including a broken television, picture frames of her parents that were burned, and the destroyed Buddha shrine. The next day, B.S. obtained an emergency protective order against Sula, which was eventually extended to three years.

### *Defense Evidence*

Sula denied threatening B.S. or waving any weapons in front of her. He did not see how the television was broken or how the pictures were burned, but admitted he had been the only one home that morning. Regarding the Buddha shrine, he claimed he used the hatchet to take it apart and carry the pieces to the backyard to repair it because it had fallen over. It weighed hundreds of pounds.

Sula believed he had a good relationship with B.S., but that she had been by herself in her room since her husband died a couple months earlier.

4

He did not know why B.S. and S.K. avoided him in the home.  He admitted they had called the police on him before.

## DISCUSSION

## I.

### *Jury Instruction on the Weapon Allegation*

Sula argues that the trial court prejudicially erred and violated his right to due process by allowing the jury to find the hatchet was "inherently" deadly and dangerous.  We are not persuaded.

### A.  *Additional Background*

Sula was charged with making a criminal threat (§ 422) and with using "a deadly and dangerous weapon, to wit:  [an] ax or hatchet" in making the threat (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).

The trial court instructed the jury as follows with CALCRIM No. 3145 on the weapon allegation in support of this offense:

> "If you find the defendant guilty of [making a criminal threat], you must then decide whether . . . the People have proved the additional allegation that the defendant personally used a deadly or dangerous weapon during the commission of that crime. . . .
>
> "A *deadly or dangerous weapon* is any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.
>
> "In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed, and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.
>
> " . . .

5

> "Someone *personally uses* a deadly or dangerous weapon if he or she intentionally does any of the following: [¶]
> 1. Displays the weapon in a menacing manner; [¶] OR [¶]
> 2. Hits someone with the weapon."

The trial court did not further define what the law determines to be an "inherently deadly or dangerous" weapon. There were no objections to the instruction.

In her closing argument, the prosecutor defined the term "deadly weapon" the same way as the trial court. She then argued that a hatchet is a deadly and dangerous weapon "[a]nd the defendant personally used it when he was waving it in a menacing manner." However, she did not argue the weapon was inherently dangerous. In his closing argument, defense counsel argued that Sula did not threaten B.S. He did not mention the weapon allegation.

The jury found Sula guilty of making a criminal threat and found that he personally used a deadly and dangerous weapon.

**B.** *Guiding Principles*

A trial court has a duty to instruct " 'on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58.) We review challenges to jury instructions de novo. (*People v. Baratang* (2020) 56 Cal.App.5th 252, 259.) We apply the harmless beyond a reasonable doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18 to claims of instructional error that are based on a legally inadequate theory of guilt. (*People v. Aledamat* (2019) 8 Cal.5th 1, 7-9 (*Aledamat*).) Under that standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id*. at p. 13.)

6

"A reviewing court must determine whether any rational jury would have found the defendant guilty based on a valid theory if the jury had been properly instructed." (*In re Lopez* (2023) 14 Cal.5th 562, 587 (*Lopez*).)

C. *Analysis*

There is no dispute that the trial court erred when it instructed that a hatchet was an inherently deadly weapon. Because a hatchet is usually "used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*Aledamat, supra*, 8 Cal.5th at p. 6 [" 'Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such' "].) In presenting the jury with two possible theories to support the deadly weapon allegation, the court improperly permitted the jury to conclude that a hatchet is inherently deadly, when it cannot be so as a matter of law. (*Id.* at pp. 6-7 [holding that a trial court errs if it instructs jurors that they may find a weapon to be inherently deadly and dangerous, when, as a matter of law, the weapon is *not* inherently deadly or dangerous]; *People v. Stutelberg* (2018) 29 Cal.App.5th 314, 317 (*Stutelberg*) [jury "instructions are flawed because they suggest the jury might properly conclude that a box cutter is inherently dangerous"].

The People contend Sula has forfeited on appeal the issue of whether the trial court erred in giving CALCRIM No. 3145 that included the "inherently deadly or dangerous" weapon instruction. We disagree. Although defense counsel failed to object in the trial court to the weapon instruction, we may "review any instruction given . . . , if the substantial rights of the defendant were affected thereby." (§ 1259; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 180, fn. 23 ["To the extent that defendants contend these asserted instructional errors violated their substantial rights,

7

we . . . review their claims pursuant to section 1259, even if these claims were forfeited"].) The legally incorrect instruction "is not of the type that must be preserved by objection." (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; cf. *People v. Powell* (2021) 63 Cal.App.5th 689, 709-710 [claim that the instructions allowed the jury to convict the defendant on a legally invalid theory "need not be preserved by objection in order to be considered on appeal"].)

After a careful review of the record, we conclude that the instructional error was harmless beyond a reasonable doubt because any rational juror hearing the evidence would have concluded that Sula used the hatchet as a deadly or dangerous weapon. (*Lopez, supra*, 14 Cal.5th at p. 589] ["If the reviewing court determines beyond a reasonable doubt that any rational juror would have made the additional findings, based on the jury's actual verdict and the evidence at trial, the error is harmless because the presentation of the invalid theory to the jury made no difference"].) The prosecutor initially repeated the same weapon enhancement instruction that the judge gave the jury, CALCRIM No. 3145, and stated, "A hatchet is certainly a deadly and dangerous weapon." However, key to our decision, the prosecutor did not address the incorrect "inherently deadly or dangerous" legal theory any further in her closing argument and instead argued that Sula *used* the hatchet in a way that it was "capable of causing" death or injury. The prosecutor urged the jury to "use your common sense" and explained that "the defendant personally used [the hatchet] when he was waving it in a menacing manner." She continued:

> "Just by the fact that he displayed the weapon in a
> menacing manner is sufficient for personal use. When
> [B.S.] was testifying, demonstrating with her hand, about
> what he was doing with that hatchet, you know what that
> hatchet can do. You had an opportunity to also watch a

video of him using the hatchet on what he described as a 300-pound Buddha house, the damage and destruction that caused and the damage and destruction that can cause to a human body."

The record thus shows the prosecutor relied on the legally correct part of CALCRIM No. 3145 in arguing the jury should find the weapon allegation true.

Additionally, we find the error harmless based on the instructions as a whole. (See, e.g., *People v. Hallock* (1989) 208 Cal.App.3d 595, 604 ["error in giving" jury instruction was "harmless" when considering "the instructions as a whole"].) For example, the court instructed the jury that "[s]ome of these instructions may not apply, depending on findings about the facts of the case. Do not assume because I give a particular instruction that I'm suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." We assume the jury followed that instruction. (*Gray v. Wagner* (1969) 272 Cal.App.2d 671, 672.) The court also instructed the jury to "consider all the surrounding circumstances, including when and where the object was possessed, and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose." As the California Supreme Court has explained,

> "This part of the instruction suggested . . . that the jury had to consider all of the circumstances in deciding whether the object was a deadly weapon, *either* inherently *or* as used. The jury would likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all of the circumstances. Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it."
> (*Aledamat, supra*, 8 Cal.5th at p. 14.)

9

The jury here was presented with evidence about the hatchet's nature, the manner it was used, and all surrounding circumstances. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 ["In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue"].) For example, a responding officer testified that Sula's hatchet had a sharp blade and could "cause a severe injury to a person if used in a violent manner," including "death" as a result of "a severe slash" of "an artery or somewhere within the body."

In addition, B.S. testified that she truly believed Sula was going to kill her with the hatchet if she did not run away. As noted, Sula was six feet away from B.S. when he swung the hatchet back and forth and threatened, "I'm doing it. I'm going to kill you." She did not "want to stand there and have him chop [her] up." The record supports the inference that the jury accepted her testimony that Sula used the hatchet as a deadly weapon and that it rejected Sula's testimony that he did not display or wave the weapon at her. Thus, the evidence supports the inference that Sula used the hatchet as a deadly or dangerous weapon. (See *People v. Graham* (1969) 71 Cal.2d 303, 328 [" 'When it appears . . . that an instrumentality . . . is capable of being used in a "dangerous or deadly" manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, . . . its character as a "dangerous or deadly weapon" may be thus established, at least for the purposes of that occasion' "].)

Sula compares his case to *Stutelberg, supra*, 29 Cal.App.5th 314, arguing that "the evidence [he] used the hatchet in a deadly and dangerous manner was not overwhelming." We disagree. In *Stutelberg*, the defendant

10

was convicted of assault with a deadly weapon as to C.L. and mayhem with a deadly weapon enhancement as to M.S. (*Stutelberg, supra*, 29 Cal.App.5th at p. 316.) The defendant was intoxicated and was denied entry into a bar when M.S. urged the defendant's friend "to take [the defendant] home to prevent police from being called." (*Ibid.*) The defendant then "started 'flicking' a box cutter toward" M.S. and C.L. (*Ibid.*) "[C.L.] yelled that he saw a knife. [The defendant] swung a fist at [C.L.] but missed. [M.S.] grabbed [the defendant] and pushed him into a light pole. [The defendant] punched [M.S.] and cut the back of her head with the box cutter." (*Ibid.*)

Not unlike the instant case, the trial court in *Stutelberg* instructed the jury that a " '*deadly or dangerous* weapon is any object, instrument, or weapon, that is inherently deadly or dangerous, or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.' " (*Stutelberg, supra*, 29 Cal.App.5th at p. 317.) On appeal, we found that the instructional error was harmless beyond a reasonable doubt as to M.S. but not as to C.L. (*Id.* at p. 322.)

Sula argues that his "waving the hatchet was less likely to cause great bodily injury than the *Stutelberg* defendant's flicking the box cutter toward [C.L.]" However, in *Stutelberg*, we explained that "[t]he exact manner in which [the defendant] used the box cutter against [C.L.] is . . . unclear" (*Stutelberg, supra*, 29 Cal.App.5th at p. 322); and that "[t]he jury could reasonably conclude that his 'flicking' motion was more of a threat, as opposed to an act likely to cause death or great bodily injury." (*Ibid.*) Here, in contrast, Sula was threatening B.S. by telling her that he was "going to kill" her while "swinging the [hatchet] back and forth" and "staring" at her in a menacing way that communicated to B.S. that he was serious about carrying out his threats. Unlike in *Stutelberg* as to victim C.L., the way Sula

11

used the hatchet is not "unclear"; rather, the evidence is sufficient to support the finding beyond a reasonable doubt that Sula used the hatchet in a deadly or dangerous manner.

The California Supreme Court's decision in *Aledamat, supra,* 8 Cal.5th 1, is instructive. There the " 'defendant pulled a box cutter out of his pocket and extended the blade; from three or four feet away, defendant thrust the blade at the man at waist level, saying, "I'll kill you." ' " (*Id.* at p. 4.) As here, the jury in *Aledamat* was instructed with CALCRIM No. 3145 to " 'consider all of the surrounding circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.' " (*Aledamat*, at p. 14.) Additionally, as here,

> "[N]o one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon. . . . Although defense counsel did not expressly concede that the box cutter was a deadly weapon, he did not contest the point. [¶] Contesting the point would have been futile based on the record here. A box cutter is not inherently deadly because it is not *designed* for that purpose. But if used to assault someone, i.e., used as a *weapon*, a box cutter *is* potentially deadly even if not designed for that purpose. . . . Counsel could readily believe it would be pointless for him to argue that even if (contrary to the argument counsel did make) the jury found defendant assaulted the victim with the box cutter, it was not a deadly weapon. This is particularly so in light of defendant's statement, 'I'll kill you.' " (*Ibid.*)

As in *Aledamat*, the jury instruction here "referred to an object that is 'inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or . . . great bodily injury.' This juxtaposition at least indicated what the 'inherently deadly' language was driving at." (*Aledamat, supra*, 8 Cal.5th at pp. 13-14) The Supreme Court

12

reasoned, "the jury must have considered the term 'inherently deadly' to mean something. . . . [T]he theoretical risk is that, because the court did not define the term, the jury might have applied its common understanding to find the box cutter deadly because it is sharp and used for cutting." (*Id.* at p. 15.) "But if the jury did so, it would necessarily find the box cutter deadly in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm—and that defendant used it as a weapon." (*Ibid.*)

Based on the instructions given here, the jury necessarily found that: (1) Sula made "a criminal threat" while (2) he "personally used a deadly or dangerous weapon, to wit: ax or hatchet." Thus, even if the jury found the hatchet to be inherently deadly, it "would necessarily find the [hatchet] deadly in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm—and that [Sula] used it as a weapon." (See *Aledamat, supra,* 8 Cal.5th at p. 15.) " 'No reasonable jury that made all of these findings could have failed to find' that defendant used the [hatchet] in a way that is capable of causing or likely to cause death or great bodily injury." (*Ibid.*) As in *Aledamat*, the instructional error here was harmless beyond a reasonable doubt.

In sum, the instructional error did not affect the verdict because any rational juror would have concluded that Sula used the hatchet in a deadly or dangerous manner.

## II.

### *One-Year Weapon Enhancement*

Sula next argues that the trial court misunderstood section 1385, subdivision (c), as recently amended by Statutes 2021, chapter 721, section 1, when it denied his request to dismiss the weapon enhancement. In the alternative, if the court understood its discretion, Sula contends that it

13

abused its discretion when it denied his request. We find these arguments unavailing.

## A. *Additional Background*

As part of his statement in mitigation and sentencing memorandum, Sula asked the court to dismiss the one-year weapon enhancement (§ 12022, subd. (b)(1)) under section 1385, subdivision (c), as amended by Senate Bill No. 81. Sula argued that his "use of methamphetamine, as a result of his depression, directly contributed to his behavior in this case." In support of his request, Sula attached a psychological evaluation that had been written after his trial. The psychologist diagnosed Sula with severe amphetamine-type substance use disorder, severe alcohol use disorder, adjustment disorder with depressed mood, and borderline intellectual functioning.

At the sentencing hearing, the trial court noted that Sula "has three felonies as a juvenile. He has nine misdemeanor convictions and nine felony convictions. Been to prison six times." After acknowledging it had reviewed Sula's psychological evaluation, the court concluded, "I can't find that . . . the mental health disorders contributed to the criminal conduct." Before imposing the additional year for the weapon enhancement, the court reiterated that the "aggregates do outweigh the mitigants significantly in terms of the conduct." The court further acknowledged its understanding of section 1385 by stating, "Given that I've imposed [sections] 12022[, subdivision] (b)(1) and 1385[, subdivision] (c), it applies to all enhancements. And you can only use one enhancement per case under [section] 1385[, subdivision] (c). I'm dismissing the [section] 667[, subdivision] (a)(1) five-year or nickel enhancement." Finally, the court acknowledged that it had "read and consider[ed] the probation report and the briefs that were filed."

14

At his sentencing, Sula did not object to imposition of the one-year weapon enhancement.

### B. Legal Framework and Guiding Principles

Senate Bill No. 81 was passed by the Legislature in 2021.  It amended section 1385 to specify "mitigating circumstances" that the trial court shall "consider and afford great weight" when deciding whether to dismiss a sentencing enhancement.  (Stats. 2021, ch. 721, § 1.)  Senate Bill No. 81 took effect before Sula was sentenced in March 2022.  Section 1385, subdivision (c), as amended, provides:

> "(c)(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

Nine mitigating circumstances that weigh in favor of dismissing an enhancement are listed in subdivision (c)(2), including whether "[t]he current offense is connected to mental illness." (§ 1385, subd. (c)(2)(D).)  The statute further provides:

> "For the purposes of subparagraph (D) of paragraph (2), a mental illness is a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to,

15

bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia.  A court may conclude that a defendant's mental illness was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, *the court concludes that the defendant's mental illness substantially contributed to the defendant's involvement in the commission of the offense*."  (*Id*., subd. (c)(5), italics added.)

We review the court's ruling under section 1385 for abuse of discretion. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)  "A court acting while unaware of the scope of its discretion is understood to have abused it."  (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

### C. *Analysis*

Relying on *People v. Scott* (1994) 9 Cal.4th 331 (*Scott*), the Attorney General argues that Sula forfeited his arguments regarding the one-year weapon enhancement by failing to object at sentencing.  Under *Scott*, "complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal."  (*Id*. at p. 356.)

While Sula acknowledges that no objection was made at sentencing, he contends this issue was "preserved . . . for review on appeal" because his

statement in mitigation sought dismissal of the weapon enhancement. We disagree. The dismissal request in Sula's statement in mitigation is not timely as it was raised well before imposition of the sentence. (*People v. de Soto* (1997) 54 Cal.App.4th 1, 9 [arguments at presentencing hearing did not preserve claims of sentencing error because "objections must be raised contemporaneously with the pronouncement of sentence"]; accord *Scott, supra*, 9 Cal.4th at p. 351 ["courts have required parties to raise certain issues at the time of sentencing" (italics omitted)].) Thus, Sula forfeited his argument that the trial court abused its discretion when it imposed the one-year weapon enhancement. Sula did not, however, forfeit his argument that the trial court misunderstood recently amended section 1385. (*People v. Panozo* (2021) 59 Cal.App.5th 825, 840 [forfeiture of challenge to the trial court's "apparent misapprehension of statutory sentencing obligations" is inappropriate].) Where the challenge is not to the trial court's exercise of its sentencing discretion, but the failure to comply with a statutory obligation, forfeiture is not appropriate. (*Ibid.*; see also *In re Sean W.* (2005) 127 Cal.App.4th 1177, 1181-1182 [no forfeiture where the defendant's claim was that the court misapprehended its discretion, not a challenge to how it exercised that discretion].)

An examination of the record establishes that the trial court understood its discretion under section 1385, subdivision (c), considered Sula's psychological evaluation and concluded that the evidence failed to show that Sula's mental disorders "substantially contributed" to his criminal conduct. In fact, the court explicitly stated that it would need to find that "the mental health disorders contributed to the criminal conduct," but that it could not find that to be true. The court clearly read Sula's psychological evaluation, commenting that it found "the manner in which [the psychologist]

17

spoke to [Sula] and things that he said weren't necessarily summarized well in terms of coming to a conclusion." The court also noted it considered the briefs and probation report, weighed the mitigating and aggravating factors related to Sula's conduct,[2] and then applied the weapon enhancement to add a year to Sula's sentence. Thus, consistent with its obligation under the statute, the court considered the evidence of Sula's mental illness before it imposed the enhancement and decided it was not a substantially contributing factor to the criminal conduct.

Despite the clear record, Sula seizes on the trial court's statement that "[the psychologist] didn't use those words" to argue that the court mistakenly believed it could not find Sula's mental disorders contributed to his criminal conduct unless the psychologist explicitly stated that to be the case. But Sula fails to consider the court's other comments, which support that the court was simply reiterating its view that even the psychologist failed to conclude that Sula's mental illness impacted his conduct. The court's other statements, "I can't find that . . . the mental health disorders contributed to the criminal conduct . . . [a]nd that's what I would need to find," clearly demonstrate its understanding that *the court* needed to find that Sula's mental health disorders contributed to the criminal conduct.

Additionally, the court's understanding of the amended statute is further demonstrated by its statement that "you can only use one enhancement per case under [section] 1385(c). I'm dismissing the 667(a)(1)

---

[2]    Although Sula argues that the trial court's finding that the aggravating factors outweighed the mitigating factors "is not germane to the section 1385 analysis here," the statute does provide that the court shall weigh evidence "of the mitigating circumstances" against the "likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

five-year or nickel enhancement." Under amended section 1385, when "[m]ultiple enhancements are alleged in a single case . . . all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).) The court therefore dismissed the five-year enhancement so that it could impose the one-year weapon enhancement. Thus, the record clearly establishes that the court was aware of its discretion under the newly amended statute.

Even if Sula had preserved his argument that the trial court abused its discretion, we would still affirm its decision to impose the one-year weapon enhancement. (§ 1385, subd. (c)(2)(B) [the trial court retains its "discretion" to decide whether to impose a sentence enhancement].) As noted above, the trial court considered Sula's psychological evaluation, the probation report, the parties' briefs, and the mitigating and aggravating factors related to Sula's conduct, before deciding to apply the one-year weapon enhancement. We conclude that the record supports the trial court's decision. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582 [" 'We must affirm unless there is a clear showing the sentence choice was arbitrary or irrational' "].)

## DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

19